*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* R. R. PIEPER, Minor.

UNPUBLISHED
October 19, 2023

No. 363538
Lenawee Circuit Court
Family Division
LC No. 20-000519-NA

Before: K. F. KELLY, P.J., and JANSEN and CAMERON, JJ.

PER CURIAM.

Respondent-father appeals as of right the trial court order terminating his parental rights to his minor child under MCL 712A.19b(3)(a)(*ii*), (g), (j), and (m)(*i*). We affirm.

## I. PROCEDURAL AND FACTUAL BACKGROUND

The minor child tested positive for barbiturates and THC following his birth in the summer of 2020. Shortly thereafter, the Department of Health and Human Services ("DHHS") petitioned the court to remove the child from the care of his mother, E. Gerber, and terminate her parental rights. The petition included allegations of substance abuse, domestic violence, and an extensive history with Children's Protective Services ("CPS"). Gerber's estranged husband, S. Hoffman, was identified as the child's legal father, but Gerber believed that her boyfriend, W. Pieper, was the child's biological father. Four days after his birth, the child was placed in a nonrelative licensed foster home, where he would remain throughout the pendency of this action.

In March 2021, in exchange for removing the request to terminate parental rights, Gerber entered a plea to the allegations in the petition. The court took jurisdiction over the child and ordered Gerber to comply with a case service plan designed to address the barriers to reunification. Ultimately, Gerber made little progress with her treatment plan and the court terminated her parental rights in June 2022.

In the months following the filing of the petition, DNA testing excluded both Hoffman and Pieper as the child's biological father. In January 2021, Gerber for the first time identified respondent as the child's possible father. In early February 2021, DHHS referred respondent for DNA testing. There were some delays attributable to both respondent and unusable DNA samples,

but test results received in August 2021 established that respondent was the child's biological father.

After the DNA testing confirmed respondent's paternity, the caseworker met with respondent in late August 2021 to inform him of the paternity results. On September 2, 2021, the trial court found that respondent was the child's legal father. The caseworker encouraged respondent to take the necessary measures to pursue a custody order. Despite this urging, respondent failed to do so. Respondent and his live-together partner failed to cooperate with DHHS's efforts to assess whether their home was suitable for placement. However, between September 2, 2021, and November 18, 2021, respondent participated in most of the weekly parenting time offered to him. But on November 18, 2021, the caseworker informed respondent that DHHS intended to file a temporary custody petition naming him, for the first time, as a respondent. Later that day, respondent informed DHHS by text message that he would no longer attend parenting time. From November 18, 2021 to February 2, 2022, respondent had no contact with the child or DHHS. On February 3, 2022, the caseworker spoke with respondent, a family team meeting was held, and respondent's visits with the child resumed on or about February 18, 2022.

On February 28, 2022, DHHS filed a supplemental petition naming respondent for the first time. The petition alleged, among other things, that respondent failed to visit his child and refused to allow workers into the home to assess suitability for placement. The petition referenced respondent's criminal history, his CPS history, and the CPS history of his live-in partner. DHHS requested that the court take jurisdiction over the child on account of respondent's actions and terminate respondent's parental rights at initial disposition.

After several adjournments, the adjudication trial and dispositional hearing went forward on June 8, 2022 and July 13, 2022. Thereafter, the trial court found that a preponderance of the evidence supported the court's assumption of jurisdiction over the child under MCL 712A.2(b)(1) and (2). It also found that DHHS had established the statutory grounds for termination by clear and convincing evidence, and that termination of respondent's parental rights was in the child's best interests. This appeal followed.

II. ANALYSIS

A. JURY TRIAL

Respondent first argues that the trial court erred by denying his request for a jury trial at the adjudicative stage. We disagree.

A trial court's decision whether to grant an untimely request for a jury trial is reviewed for an abuse of discretion. *In re Hubel*, 148 Mich App 696, 697; 384 NW2d 849 (1986).[1] An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled

---

[1] "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority." *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012).

outcomes. *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604; 886 NW2d 135 (2016). This Court reviews de novo questions involving the interpretation of court rules. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). When called upon to interpret and apply court rules, this Court applies the principles governing statutory interpretation. *In re Mota*, 334 Mich App 300, 311; 964 NW2d 881 (2020). Court rules should be interpreted to effectuate the intent of the drafter, the Michigan Supreme Court. *Id.* Further, clear and unambiguous language should be given its plain meaning and enforced as written. *Id.*

A party is entitled to a jury trial only at the adjudicative phase of a child protective proceeding. MCR 3.911(A); *In re Sanders*, 495 Mich 405-406. The procedure for demanding a jury for adjudication is governed by MCR 3.911(B), which provides:

> (B) Jury Demand. A party who is entitled to a trial by jury may demand a jury by filing a written demand with the court within:
>
> (1) 14 days after the court gives notice of the right to jury trial, or
>
> (2) 14 days after an appearance by an attorney or lawyer-guardian ad litem, whichever is later, but no later than 21 days before trial.
>
> The court may excuse a late filing in the interest of justice.

In this case, respondent's jury demand was untimely and the interests of justice did not require excusing the late filing.

A supplemental petition seeking jurisdiction and termination of respondent's parental rights was filed on February 26, 2022. Respondent appeared at the March 1, 2022 preliminary hearing with his appointed counsel, Michael Brooks. The court twice informed respondent of the right to a jury trial. The court notified respondent of the March 22, 2022 trial date, and specifically informed respondent that if he wished to have a jury trial, he would need to make a demand in writing within 14 days of the date of the hearing.

On March 22, 2022, the day set for the adjudication trial, respondent requested an adjournment. The court granted this request "to allow for further consultation, preparation, and exploration of possible resolution." Trial was adjourned until April 1, 2022.

On April 1, 2022, respondent's new attorney, Suzanne Wilhelm, again moved to adjourn the trial. The court again granted an adjournment to allow for further consultation, preparation, and a family team meeting regarding parenting-time suspension. Trial was adjourned to April 26, 2022.

When the matter resumed on April 26, 2022, Wilhelm requested that the court address a "preliminary" matter. She indicated that respondent wished to have a jury trial. The court considered and denied respondent's request. The court explained that the request was untimely and there existed no "good cause" to grant an untimely demand for a jury trial. Then, on respondent's behalf, Wilhelm again requested that the trial be adjourned. The court agreed to adjourn the trial to May 27, 2022, but indicated that this would be the last adjournment.

Sometime after the April 26, 2022 hearing, respondent retained attorney Charles Noe. On May 3, 2022, Noe filed an appearance, a substitution of counsel, a demand for discovery, and a demand for a jury trial. The court refused to accept, as untimely, respondent's jury demand. On May 12, 2022, respondent moved for a jury trial. Respondent argued both that he was not "cognizant" of his right to a jury trial and that he always wanted a trial by jury. Respondent asserted that because he had always evidenced a willingness to cooperate with DHHS, he had shown "good cause." On May 24, 2022, respondent again moved to adjourn the trial. The court granted the motion to adjourn to allow the parties to "review March 1, 2022 pretrial in this matter [and] for the motion for jury trial to be heard." Trial was rescheduled for June 8, 2022.

On June 7, 2022, the court heard and denied respondent's motion for a jury trial. The court found that the jury demand was untimely and that the interests of justice did not require that the court grant the untimely request.

The trial court did not abuse its discretion when it denied, on two occasions, respondent's request for a jury trial. Applying the plain language of MCR 3.911(B), respondent's demands for a jury trial were untimely. Respondent was informed of his right to a jury trial and the proper method by which to preserve that right at the March 1, 2022 hearing. Applying the plain language of the court rule, respondent could have filed a demand for a jury trial up to March 15, 2022. Respondent did not file a demand within the time prescribed and, accordingly, his later demands, asserted orally on April 26, 2022, and in writing in May 2022, were untimely.

Further, it is immaterial that the date of the adjudication trial was repeatedly adjourned. Respondent asserts that his last demand for a jury trial was timely because it was made more than 21 days in advance of the eventual trial date of June 8, 2022. However, there is no support for respondent's suggestion that each time an adjudication trial is adjourned, the clock for filing a jury demand restarts and a demand would be timely as long as it was made 21 days before the newly scheduled trial. Such an interpretation is inconsistent with the plain language of MCR 3.911(B), and would render nugatory nearly the entire court rule.

Respondent correctly notes that even if a respondent fails to make a timely jury demand, the court may excuse the late demand "in the interest of justice." MCR 3.911(B). This is a discretionary decision and, after reviewing the record, the trial court did abuse its discretion when it declined to excuse the late request. Respondent made no mention of a jury trial within the requisite time. Further, additional delays in holding the adjudication trial would not benefit any of the parties. The child, whose well-being constituted the focus of the child protective proceeding, had already been waiting almost two years for finality. Some of this time was attributable to Gerber failing to disclose respondent's potential paternity until the child was approximately six months old. But respondent's requested adjournments also contributed to the delay in adjudication. At the March 1, 2022 preliminary hearing, the court informed respondent that the scheduling of jury trials were much farther out than bench trials. The primary interests of the child would not have been served had the trial court granted respondent an adjudication trial by jury. Further delay was not in the child's best interests. The interests of justice in this case did not weigh in favor of excusing respondent's late request for a jury trial. The need to move the case forward after earlier adjournments was sufficient reason to deny respondent's belated request, which would have required yet another adjournment.

Additionally, respondent failed to offer persuasive reasons in furtherance of his claim that the interests of justice warranted excusing the untimely jury demand. In his motion and during the subsequent hearing, respondent's counsel indicated that respondent was not aware of his right to a jury trial, but this assertion is not supported by the record, which clearly indicates that respondent was twice advised of his right to a jury trial at the March 1, 2022 preliminary hearing. Respondent's counsel also argued that respondent had shown his willingness to cooperate with DHHS. It is unclear how this representation, if true, would warrant the granting of an untimely jury demand. In any event, the record demonstrated that respondent did not cooperate with DHHS's efforts. Indeed, because he did not like the conditions DHHS put on parenting time, he told the department that he would no longer attend visits with his child. He then waited three months before he expressed a desire to visit again. Respondent did not provide below, and has not provided on appeal, any argument that would support a finding that the interests of justice warranted granting his untimely request for a jury trial.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, respondent argues that he was denied the effective assistance of counsel. This Court applies criminal law principles to claims of ineffective assistance of counsel in child protective proceedings. *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). Because respondent did not move for a new trial or a *Ginther*[2] hearing in the trial court, and because this Court denied his motion to remand, our review of this issue is limited to mistakes apparent on the record. *People v Solloway*, 316 Mich App 174, 188; 891 NW2d 255 (2016).

The issue of ineffective assistance of counsel is a mixed question of fact and law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Effective assistance of counsel is presumed and respondent has a heavy burden to prove otherwise. *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015). To establish a claim of ineffective assistance of counsel, respondent "must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *People v Riley*, 468 Mich 135, 140; 659 NW2d 611 (2003). "In order to demonstrate that counsel's performance was deficient, [respondent] must show that it fell below an objective standard of reasonableness under prevailing professional norms. In so doing, [respondent] must overcome a strong presumption that counsel's performance constituted sound trial strategy." *Id.* Establishing prejudice necessarily requires demonstrating a reasonable probability that the result of the proceedings would have been different but for counsel's error. *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). Respondent has the burden of establishing the factual predicate for his claim. *Putman*, 309 Mich App at 248.

After reviewing the record, we conclude that respondent has not overcome the presumption that he received the effective assistance of counsel. Respondent's claim that he was denied the effective assistance of counsel appears to be twofold. Initially, he argues that his first appointed counsel, Brooks, failed to timely demand a jury trial on his behalf. Respondent also asserts that his second appointed counsel, Wilhelm, showed a gross misunderstanding of child protective

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

proceedings. Respondent ultimately concludes that, as a consequence of his attorneys' deficient performance, he was not afforded a jury trial.

Respondent has failed to demonstrate that Brooks's legal representation fell below an objective standard of reasonableness. On the existing record, there is no evidence that respondent advised Brooks at any time that he wanted a trial by jury. In support of his motion to remand, respondent submitted an affidavit claiming that he instructed Brooks to file a jury demand after the March 1, 2022 hearing. Brooks submitted his own affidavit averring that he discussed with respondent the right to a trial by jury and informed respondent that juries "tend to take a dim view of situations similar to his." According to the affidavit, Brooks then instructed respondent to consider the matter and contact him within two weeks to advise how he wished to proceed. Brooks never heard from respondent again. Even if we were to consider the competing affidavits, there is no conclusive evidence that Brooks's performance was deficient because he disregarded respondent's stated instructions.

Regarding Wilhelm, the record discloses that when the parties appeared on April 26, 2022, presumably for the adjudication trial, Wilhelm requested a jury trial. She also indicated that respondent wished to enter a plea and then be given an opportunity to participate in a case service plan and work toward reunification. The court denied respondent's request for a jury trial. It then questioned the apparent inconsistency between demanding a jury trial while simultaneously requesting the opportunity to enter a plea and participate in a treatment plan. In response to the court's inquiry, Wilhelm stated: "He admits to most of the petition. He admits to all the relevant parts of it. He only denies three parts of it but if we had the trial we would go ahead and talk about those in the trial as well . . . ." The court then went off the record for a sidebar. When the matter went back on the record, Wilhelm repeated her request that respondent be given an opportunity to work toward reunification. Wilhelm admitted that she advised respondent to "voluntarily release" his parental rights, but he did not wish to do so. The court then advised respondent that if he admitted everything in the petition, the court could consider those admissions when deciding whether to terminate his parental rights. Immediately thereafter, Wilhelm stated that respondent did not wish to enter a plea. The court then rescheduled the adjudication trial for May 27, 2021.

The foregoing colloquy suggests that Wilhelm was attempting to negotiate a similar compromise that had been offered to respondent-mother Gerber, namely, that respondent would be willing to enter a plea of admission for purposes of adjudication if DHHS would withdraw its request for termination of parental rights, seek only temporary custody, and then permit respondent to participate in a treatment plan. Failing that, Wilhelm appeared to be seeking, in the alternative, a jury trial.

The record does not support respondent's assertion that Wilhelm's representation was deficient. At most, the record establishes that she was perhaps too candid when attempting to negotiate a plea arrangement that is common in many child protective proceedings. In any event, respondent has not identified how Wilhelm's conduct resulted in respondent not being afforded a jury trial, which is the only deprivation he claims.

With regard to both attorneys, respondent has failed to show that their representation fell below an objective standard of reasonableness. More significantly, respondent makes literally no attempt to explain how he was prejudiced by his attorneys' alleged failure to preserve his right to

a jury trial. For purposes of his ineffective-assistance claim, respondent does not contend that a jury would have decided the matter differently. In other portions of his brief respondent does assert, in passing, that because the court had been presiding over this matter for several months related to Gerber, the court was privy to information that a jury would have never heard. Even if this is true, respondent has not explained how this affected the outcome of the proceedings. To prevail on an ineffective-assistance claim, a respondent must demonstrate a reasonable probability that but for counsel's errors, the result of the proceedings would have been different. Respondent has not attempted to make such a showing. Petitioner was only required to establish jurisdiction by a preponderance of the evidence. MCR 3.972(C)(1). In light of the testimony offered at the trial, there is no reasonable probability that a jury would have concluded that jurisdiction had not been established. Therefore, respondent has not demonstrated that he was deprived of the effective assistance of counsel at the adjudicative phase of the proceedings.

## C. JURISDICTION

Next, respondent challenges the trial court's exercise of jurisdiction over the child. Because a preponderance of the evidence supports statutory grounds for jurisdiction under MCL 712A.2(b)(1) and (2), we find no error.

"Child protective proceedings are generally divided into two phases: the adjudicative and the dispositional." *In re Brock*, 442 Mich 101, 108; 499 NW2d 752 (1993). The adjudicative phase determines whether the trial court may exercise jurisdiction over the child. *Id.* To establish jurisdiction, the petitioner must prove by a preponderance of the evidence that a statutory basis exists under MCL 712A.2(b). *In re SLH*, 277 Mich App 662, 669; 747 NW2d 547 (2008). A "preponderance of the evidence" means evidence of a proposition that when weighed against the evidence opposed to the proposition "has more convincing force and the greater probability of truth." *People v Cross*, 281 Mich App 737, 740; 760 NW2d 314 (2008).

The trial court exercised jurisdiction under MCL 712A.2(b)(1) and (2), which provide that a court has jurisdiction over a child in the following circumstances:

> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . .

> * * *

> (2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. . . .

The evidence established that in August 2021, DNA testing confirmed that respondent was the child's biological father. At a hearing on September 2, 2021, the court declared respondent to be the child's legal father. At that hearing, the foster care worker explained to respondent his right

to obtain custody of the child through the court. Thereafter, although respondent knew that the child was in a precarious situation, he admitted in his trial testimony that from September 2021 until February 2022, he did not seek any legal remedy to obtain custody of the child.

Further, during this same approximate five-month period, respondent refused to cooperate with DHHS's efforts to assess respondent's home to ascertain whether it was suitable for placement. Respondent admitted that he and his partner would not allow DHHS into their home because his partner was not allowed to attend parenting time with the child. In fact, at the time the petition was filed, respondent still had not allowed a full home assessment to occur.

Even more compelling, respondent acknowledged that on November 18, 2021, he informed the caseworker that he would no longer be attending parenting time. Respondent admitted that he stopped visiting the child because he felt that the agency was attacking and slandering him. Respondent only reengaged with the child after the caseworker sent a Facebook message to respondent on January 24, 2022, encouraging him to visit the child. Respondent replied to the message on February 2, 2022, a family team meeting was held, and respondent resumed parenting time on February 18, 2022. Thus, respondent allowed 92 days to pass without seeing the child.

In addition to the foregoing evidence, respondent testified that he was previously convicted of criminal sexual conduct and sentenced to 23 months' imprisonment. Evidence established that he pleaded guilty to two counts of assault with intent to commit criminal sexual penetration, MCL 750.520g(1). He was released in 2019, and remained on parole for two years. During that time, respondent violated his parole when he tested positive for marijuana and served an additional five days in jail. Respondent admitted that he continued to use marijuana. There was also testimony during trial that in October 2021 and January 2022, CPS investigated allegations that respondent's older son had been sexually assaulted by the cousin of respondent's partner.

A preponderance of the evidence supports the trial court's finding that respondent refused to provide proper care and custody, abandoned his child, and on account of respondent's criminality, respondent's home was an unfit place for the child to live. Accordingly, the trial court did not clearly err when it exercised jurisdiction over the child under MCL 712A.2(b)(1) and (2).

As part of this argument, respondent contends that once the court determined that he was the child's legal father, but failed to immediately place the child in respondent's home despite that DHHS had not named him in a petition, the trial court and DHHS unconstitutionally infringed on his right to know and associate with his child. Respondent then reasons that, under these circumstances, it was legally impossible to conclude that he abandoned the child. In support of this proposition, respondent relies on this Court's recent decision in *In re Dixon*, ___ Mich App ___; ___ NW2d ___ (2023) (Docket No. 363388). Respondent's reliance is misplaced.

In *In re Dixon*, the mother gave birth to the minor child, AKD, in June 2021. *Id*. at ___; slip op at 1. Within days, DHHS petitioned for AKD's removal and termination of the mother's parental rights. *Id*. at ___; slip op at 1. At the time AKD was born, the respondent-father was incarcerated, but DHHS knew that the respondent-father was the child's likely father. *Id*. at ___; slip op at 1. By September 2021, DNA testing confirmed the respondent-father's paternity, and the respondent-father had executed an acknowledgment of parentage. *Id*. at ___; slip op at 2. DHHS then waited 15 months after AKD was placed in foster care to file and serve a petition

naming the incarcerated respondent-father as a respondent. *Id*. at ___; slip op at 2-5. In the interim, the respondent-father urged the court to place his son with "PM," his significant other and fictive kin. *Id*. at ___; slip op at 2-5. The trial court rejected this placement option and the respondent-father appealed the trial court's removal order. *Id*. at ___; slip op at 6. Although this Court was troubled by DHHS's delays, it ultimately affirmed the removal because the trial court "reasonably determined that the fictive kin suggested by [the respondent-father] was an inappropriate placement." *Id*. at ___; slip op at 1.

On appeal, the respondent-father argued that before he was officially named as a respondent, he had an unfettered right to place AKD with anyone of his choosing. *Id*. at ___; slip op at 7. This Court framed the question presented as "what procedural protections must be afforded to protect the constitutional right of a late-identified parent to select a relative or fictive kin placement when the child is already in the care and custody of the state?" *Id*. at ___; slip op at 7. This Court recognized the complexity of the situation based on the facts and stated:

> We wholeheartedly concur with our dissenting colleague's position that a fit parent has a constitutional right to place his child with anyone he deems appropriate. And father was not even preliminarily determined to be unfit until his child was more than a year old. *But AKD was under the DHHS's care and supervision by the time father had the legal ability to place the child.* Father's incarceration and his absence at the child's birth put him in the unenviable position of being unable to directly place his child without DHHS input. When he was able to direct AKD's placement, the child was 5½ months old and living in a stable foster family placement. [*Id.* at ___; slip of at 9 (emphasis added).]

This Court went so far as to conclude that the respondent-father's constitutional rights were impacted, stating:

> The state may not infringe a parent's "right to direct the care, custody, and control of his children . . . without *some* type of fitness hearing." *In re Sanders*, 495 Mich 394, 414-415; 852 NW2d 524 (2014). Here, the court and the DHHS bypassed father's right to direct the placement of his child by delaying his legal ability to assert that right. Mother was sure of paternity at birth as she named AKD after his father. AKD was only three months old when DNA analysis established father's parentage. Father then immediately signed an [acknowledgment of paternity], but an "official copy" required to name father as a legal parent was delayed through no fault of his own. AKD was in care for almost 15 months before the DHHS served a petition naming father as a respondent. Even when the DHHS finally authored a petition against father shortly before AKD's first birthday, it waited three months to serve it. There is no legitimate excuse for the DHHS's failure to timely declare father a respondent. Such delays run counter to the purpose of the Juvenile Code, which is the protection of children. *In re Jagers*, 224 Mich App 359, 362; 568 NW2d 837 (1997). And these delays impinged on father's constitutional rights. [*Id*. at ___; slip of at 6-7.]

Yet this Court then recognized that the right to direct the care and custody of one's child is not necessarily unfettered:

As in *Sanders*, father here enjoyed a constitutional right to direct the care and custody of AKD before he was adjudicated. But in *Sanders*, as here, the legal analysis does not stop with that observation. When a child has been placed into care by an unchallenged order of the court, the state has a legitimate and important interest in protecting the child's health and safety. When vindication of an unadjudicated parent's custodial right will necessarily involve a court-ordered custodial change and the elimination of state custody, the state's interest permits the maintenance of continued, temporary placement while an investigation is conducted to ensure the appropriateness of the new placement. [*Id.* at ___; slip op at 10.]

This Court went on to note:

We sympathize with father's position but under the circumstances presented here, father's right to control the custody and care of his child must yield, at least temporarily, to the state's interest in preventing upheaval for AKD, a vulnerable child who has been in care with the same foster family for nearly two years. Balancing the interests as [*Mathews v Eldridge*, 424 US 319; 96 S Ct 893; 47 L Ed 2d 18 (1976)] supports that we do, we conclude that in this case, the court did not err by *initially* refusing to transfer AKD's custody. But as discussed below, the evidentiary basis for this refusal was not well fleshed out, and on remand we direct that the DHHS conduct a second and more detailed home study of PM forthwith. [*Id.* at ___; slip op at 11.]

In this case, relying on *In re Dixon*, respondent seems to be arguing that after he was declared the child's legal father on September 2, 2021, he had the constitutional right to direct the care and custody of the child before he was adjudicated. He further asserts that DHHS and the trial court infringed upon that right and then used the consequences as a basis for jurisdiction. However, the Court's analysis in *In re Dixon* does not permit such a broad conclusion. Indeed, this Court specifically recognized that a parent's right to control the custody and care of his child must yield to the state's interest in protecting a vulnerable child from unnecessary trauma. *Id.* at ___; slip op at 11.

The Court's analysis in *In re Dixon* actually supports the actions taken by DHHS and the trial court in this case. Indeed, this Court recognized that the state's interest permitted maintenance of the child's temporary placement while an investigation was conducted to insure the suitability of the father's proposed placement. *Id.* at ___; slip op at 10-11. This is exactly what occurred in the present matter. At the time respondent was declared to be the child's legal father, he had never met the child, who was then 14 months old. Because the child had already been placed in care under an unchallenged court order, DHHS had a legitimate and important interest in protecting the child's health and safety. The child had been in the same foster home since his birth. Abruptly removing him from the only home he had ever known and placing him with a virtual stranger was not in the child's best interests. DHHS had an interest in preventing upheaval for the child. To this end, DHHS offered respondent an opportunity to establish a bond with the child so that placing the child in respondent's custody would not traumatize the child, but would be a natural transition into a parent's home. Instead of taking full advantage of the opportunity, respondent went three months without visiting his child. Similarly, respondent did not cooperate with DHHS's attempts

to assess the suitability of his home. Respondent's rights necessarily yielded to the state's interest in protecting the child from being abruptly uprooted from his stable foster home.

## D. STATUTORY GROUNDS

Respondent also challenges the trial court's findings that statutory grounds for termination were established by clear and convincing evidence. We find no error.

In order to terminate parental rights, the trial court must find that at least one statutory ground for termination has been established by clear and convincing evidence. *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated respondent's parental rights to the child under MCL 712A.19b(3)(a)(*ii*), (g), (j), and (m)(*i*), which permit termination of parental rights when:

> (a) The child has been deserted under either of the following circumstances:
>
> * * *
>
> (*ii*) The child's parent has deserted the child for 91 or more days and has not sought custody of the child during that period.
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.
>
> * *
>
> (m) The parent is convicted of 1 or more of the following, and the court determines that termination is in the child's best interests because continuing the parent-child relationship with the parent would be harmful to the child:
>
> (i) A violation of section 136, 136a, 316, 317, 520b, 520c, 520d, 520e, or 520g of the Michigan penal code, 1931 PA 328, MCL 750.136, 750.136a, 750.316, 750.317, 750.520b, 750.520c, 750.520d, 750.520e, and 750.520g.

MCL 712A.19b(3)(a)(*ii*) permits termination if the parent has deserted the child for 91 or more days and has not sought custody of the child during that period. As more fully described above, after respondent was recognized as the child's legal father, he waited five months to explore any legal channels to acquire custody of the child. During this time, he refused to allow a home assessment necessary to evaluate the suitability of placement. Most significantly, respondent intentionally stopped visiting the child for 92 days, and did not stay in contact with the caseworker. Although a couple of weeks before visits resumed on approximately February 18, 2022, respondent indicated that he wanted to resume parenting time and he did attend a team meeting, this can hardly be deemed an effort to seek custody of the child. Respondent had not followed through with any steps necessary to obtain legal custody, he had gone months without seeing the child, and it was the caseworker who initiated efforts to encourage respondent to reengage in visits, which resulted in parenting time resuming the week of February 18, 2022. "Desertion is an intentional or willful act" that cannot be established on a parent's involuntary conduct. *In re B & J*, 279 Mich App 12, 18 n 3; 756 NW2d 234 (2008). In this case, respondent's conduct was not involuntary. It was purposeful and deliberate.

Although the foregoing events were sufficient to exercise jurisdiction over the child, this same body of evidence clearly and convincingly established statutory grounds for termination as well. Accordingly, the trial court did not clearly err when it found that the evidence supported termination under MCL 712A.19b(3)(a)(*ii*).

The evidence also supports the trial court's termination of respondent's parental rights under MCL 712A.19b(3)(g). This statutory ground permits termination of parental rights when a parent, although financially able to do so, fails to provide proper care or custody, and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age. *Id.* Respondent argues that he was employed, had suitable housing, had demonstrated the ability to parent a child because he was caring for three other children, had secured child care, and his drug screens were negative for illegal controlled substances. The picture respondent paints regarding his ability to provide for another child, however, is not complete.

Respondent ignores that he initially failed to engage when his paternity was established despite being aware that his child was in a precarious position. Then there was evidence of his wholesale failure for months to visit the child, seek custody, or stay in communication with the caseworkers. During the June 2022 hearing, respondent testified that he filed custody paperwork in either late February or mid-March 2022. This would have been either right at the time of the filing of the February 28, 2022 petition or shortly after the petition was filed. In addition, there was no evidence that respondent ever contributed financially to the child's care in any meaningful way. He testified that he brought the child blocks and allowed the child to take two cars and a cup home after parenting time. Respondent touts his ability to provide a stable home for the child, but he testified that his name was not on the lease for the apartment he shared with his partner. Further, in support of his claimed stability, respondent asserted that he had been in a stable, loving relationship with his partner for eight years, but he admitted that during this relationship his partner gave birth to two children fathered by another man, and he fathered the child at issue in this appeal with another woman. From the foregoing evidence, the trial court properly concluded that there was clear and convincing evidence that once respondent learned he was the child's legal father, he failed to provide proper care and custody.

The court also found that there was clear and convincing evidence to support termination under MCL 712A.19b(3)(j), which allows for termination of parental rights when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." The evidence supports the trial court's finding that the child was reasonably likely to be harmed if placed in respondent's care. There was no evidence that respondent was fully committed to providing for the child in the long run. When respondent first learned that the DNA testing established his paternity, he expressed uncertainty regarding whether he wanted to be involved, and then he did not cooperate with DHHS's efforts to assess placement or create a bond with the child. Respondent then stopped visiting the child altogether because he perceived he was being attacked by DHHS. The trial court could conclude from this conduct that respondent was not fully committed to his child and willing to put the child's needs ahead of his own. Accordingly, the trial court did not clearly err by finding clear and convincing evidence to terminate respondent's parental rights under MCL 712A.19b(3)(j).

Lastly, the trial court did not clearly err when it terminated respondent's parental rights under MCL 712A.19b(3)(m)(*i*), which provides that a court may terminate a respondent's parental rights when the parent has been convicted of one or more listed offenses and "the court determines that termination is in the child's best interests because continuing the parent-child relationship would be harmful to the child." Respondent admits that he was convicted of violating MCL 750.520g(1), which is one of the listed offenses. As noted in the above analysis of MCL 712A.19b(3)(j), there was also clear and convincing evidence that continuing the parent-child relationship would be harmful to the child. Thus, the trial court did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights under MCL 712A.19b(3)(m)(*i*).

## E. BEST INTERESTS

Lastly, respondent challenges the trial court's finding that termination of his parental rights was in the child's best interests. Again, the trial court did not err.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2001). These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over the parent's home, the parent's compliance with the case service plan, the parent's visitation history with the child, the child's well-being while in care, and the possibility of adoption. *Id.* at 713-714. In addition, the trial court should consider the child's safety and well-being, including the risk of harm a child might face if returned to the parent's care. See *In re VanDalen*, 293 Mich App 120, 142; 809 NW2d 412 (2011). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009).

"The trial court should weigh all the evidence available to determine the child[]'s best interests." *In re White*, 303 Mich App at 713. The court's focus must be on the child and not the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *Id.* at 90. This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App at 129.

The child was four days old when he was removed from his mother's care and placed in a nonrelative foster home. At the time of termination of respondent's parental rights, the child had been in this same foster home for more than two years. The foster parents' home was the only home the child had ever known. The child was doing well in the foster home and the foster parents were ensuring that all of the child's needs were being met. The caseworker testified, and the trauma assessment also found, that a strong bond existed between the child and the foster parents. There was also testimony that a natural sibling relationship had formed with the other children in the foster home.

Through the April 2022 trauma assessment, it was established that the child had special needs. The child presented with features suggestive of fetal alcohol exposure, as well as speech and language delays, poor regulation, and behavioral dysfunction. The clinicians recommended several services for the child and parenting education programs for the child's caregivers. Regarding the child's placement, the clinicians recommended that he stay with his current foster family because of lack of contact with respondent. The testimony further established that at the time of termination, the child was participating in mental health treatment and the foster parents were ensuring that he received the care he required. This was particularly important because the foster parents wished to adopt the child if the court terminated respondent's parental rights.

Evidence clearly established that respondent's decision to abruptly and intentionally forgo parenting time for months was detrimental to the child's well-being and emotional health. Indeed, the court suspended respondent's parenting time on March 22, 2022, because it found that continued contact with respondent would be harmful to the child. At an April 26, 2022 hearing, the court revisited that decision and considered the testimony of the foster father, T. Keller, regarding whether there was any correlation between the child's behavioral issues and visitation with respondent. Keller and his wife created a chart to document the child's sleeping and eating patterns vis-à-vis visits with respondent. Keller testified that there were several months during which respondent and the child did not visit. When the parenting time resumed, Keller noticed an increase in the child's behavioral issues, but since the court recently suspended parenting time, the child had been sleeping through the night. Thus, there was evidence from which the court could conclude that the child's continued relationship with respondent would be harmful and not in the child's best interests.

There was no evidence that a bond existed between respondent and the child. When parenting time resumed briefly between February and March 2022, the caseworker noted that the child was agitated and uncomfortable during visits with respondent. Respondent contends that lack of a bond was a product of DHHS's delay in naming him as a respondent in the petition. We disagree. The absence of a bond was directly related to respondent's lack of contact with the child for three months while he believed that he had been attacked and slandered by the agency. Moreover, contrary to respondent's claim, he was informed early on that he could have sought

direct placement of the child. After the September 2, 2021 hearing, the caseworker discussed with respondent his right to seek custody of the child.

There was also evidence from which the court could infer that respondent lacked the ability to parent his special-needs child. First, respondent's conduct during the six months after he was determined to be the child's legal father demonstrated respondent's lack of parenting skills. Respondent clearly was unable to put his child's needs above his own. Further, respondent admitted that he did not have the tools and skills necessary to parent a special-needs child. Indeed, he admitted that approximately a month before trial, he started parenting classes so that he could obtain those skills. Respondent further testified at the June 2022 hearing that he had only one class remaining, but documentation established that he had attended only 5 of the 11 classes.

At the time the court terminated respondent's parental rights, the child had been in foster care for more than two years. He required permanency, stability, and finality. The caseworker opined that if the court did not terminate respondent's parental rights, it would take respondent at least a year to participate in a case service plan and establish a bond with the child. The child did not have another year to wait for permanence and stability. The court weighed relevant factors and did not clearly err by finding that termination of respondent's parental rights was in the child's best interests.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Kathleen Jansen
/s/ Thomas C. Cameron